## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| JUAN CAMILO JIMENEZ, derivatively on behalf of NUTEX HEALTH INC., <br><br> Plaintiff, <br><br> v. <br><br> THOMAS T. VO, JON C. BATES, WARREN HOSSEINION, MITCHELL CREEM, CHERYL GRENAS, MICHAEL L. REED, SCOTT J. SAUNDERS, and KELVIN SPEARS, <br><br> Defendants, <br><br> and <br><br> NUTEX HEALTH INC., <br><br> Nominal Defendant. | Case No: 4:25-cv-04253 <br><br> **JURY TRIAL DEMANDED** |

## **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Juan Camilo Jimenez ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Nutex Health Inc. ("Nutex" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Thomas T. Vo ("Vo"), Jon C. Bates ("Bates"), Warren Hosseinion ("Hosseinion"), Mitchell Creem ("Creem"), Cheryl Grenas ("Grenas"), Michael L. Reed ("Reed"), Scott J. Saunders ("Saunders"), and Kelvin Spears ("Spears") (collectively, the "Individual Defendants," and together with Nutex, "Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of their fiduciary duties as directors and/or officers of Nutex, unjust enrichment, abuse of control,

- 1 -

gross mismanagement, waste of corporate assets, and for contribution against Defendants Vo, Bates, and Hosseinion under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nutex, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from August 8, 2024 to August 14, 2025, both dates inclusive (the "Relevant Period").

2.      Nutex is a Houston-based healthcare company which operates its own healthcare facilities in addition to provider networks. The Company operates 24 hospital facilities across 11 states, and features a variety of facility models including micro-hospitals, specialty hospitals, and hospital outpatient departments.

3.      In addition, the Company operates provider networks for potential patients, namely independent physician associations ("IPAs"). The Company's largest IPA is located in Los Angeles, California, and oversees approximately 33,000 patients. Moreover, the Company

operates a real estate division which owns the land and structures leased to the Company's hospital facilities.

4.      Nutex facilities generally function as out-of-network providers of healthcare. Additionally, most of the Company's revenue derives from third-party payors of patients such as commercial insurance carriers.

5.      Traditionally, patients who received treatment from an out-of-network provider were often not fully covered under their insurance plans. As such, patients who received out-of-network care often faced higher bills than if they had received the same care from an in-network provider. Moreover, out-of-network providers could circumvent insurance carriers and bill the patient directly for the difference between the amount billed to the patient and the amount paid by their insurance carrier. This practice is also known as "balance billing."

6.      However, in December 2020 Congress passed the No Surprises Act ("NSA"), which took effect on January 1, 2022. Under the NSA, healthcare providers were prohibited from billing patients a greater amount than the in-network cost sharing amount for such care. As such, the NSA required the application of in-network cost sharing to out-of-network claims. Further, the NSA created an independent dispute resolution ("IDR") process to establish payment amounts when open negotiations fail to materialize.

7.      Given that Nutex operated primarily as an out-of-network provider, a large portion of its revenue derived from the higher prices it was able to charge patients as compared to if such patients were in the Company's network. Thus, the Company's financial prospects began to suffer as the NSA required it to charge the median in-network rate of a patient's healthcare plan.

8.      In order to overcome this material change in the Company's business strategy,

Nutex turned to HaloMD, a third-party IDR vendor. Over the next successive months, HaloMD's IDR efforts yielded a considerable amount of revenue from the Company's patients and their healthcare providers.

9.    Throughout the Relevant Period, the Individual Defendants touted HaloMD's ability to generate revenue for the Company, and Nutex's positive financial trajectory in light of the NSA. However, in reality, HaloMD's method of generating substantial revenue through IDR was in fact a scheme to defraud insurance companies. Moreover, the Company failed to address material weaknesses in its internal control over financial reporting, despite acknowledging the existence of such weaknesses.

10.    For instance, on August 8, 2024, the first day of the Relevant Period, the Company issued a press release announcing its financial and operational results for the second quarter of 2024 (the "2Q 2024 Press Release"). The 2Q 2024 Press Release quoted Defendant Vo as stating "***Our average payment by insurers of patient claims increased, a trend we are optimistic will persist as we continue to work the NSA claims through the [IDR] process[.]***"[1]

11.    The truth began to emerge on July 22, 2025, when Blue Orca Capital ("Blue Orca") issued a report (the "Blue Orca Report") which alleged, *inter alia*, that "HaloMD achieved dramatically lucrative results for clients like Nutex by engaging in a coordinated fraudulent scheme to steal millions of dollars from insurance companies on behalf of and in conjunction with its healthcare billing clients."

12.    On this news, the price per share of Nutex's stock fell $11.18, or 10.1%, from a closing price of $111.19 per share on July 21, 2025 to close at a price of $100.01 per share on July

---

[1] Unless otherwise stated, all emphasis herein is added.

22, 2025.

13.     Nevertheless, the Company issued a press release on July 24, 2025 which stated that it "strongly disagrees with the allegations in the report" and that it "expects to provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of 2025 due on or before August 14, 2025."

14.     Yet, after the market closed on August 14, 2025, the Company issued another press release stating that it would "delay filing its Form 10-Q for the period ending June 30, 2025." The press release stated that the delay was due to "non-cash accounting adjustments related to the treatment of stock-based compensation obligations for certain under-construction and ramping hospitals, as disclosed in previous filings."

15.     On this news, the price per share of Nutex's stock fell $18.22, or roughly 16.4%, from a closing price of $111.13 per share on August 14, 2025 to close at $92.91 on August 15, 2025.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company engaged HaloMD to serve as its IDR vendor; (2) HaloMD engaged in fraudulent conduct to achieve substantial arbitration results for Nutex; (3) the revenue generated through the engagement of HaloMD was unsustainable; (4) the Company failed to maintain internal controls, particularly regarding its financial reporting; (5) the Company overstated its ability to remediate

such failure to maintain internal controls; (6) on account of such failure to maintain internal controls, the Company improperly calculated particular stock based compensation obligations by treating such obligations as equity as opposed to liabilities; (7) as a result of the foregoing, the Company would be substantially less likely to timely file its reports with the SEC. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

17.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its President to a federal securities class action lawsuit pending in the United States District Court for the Southern District of Texas (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

18.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Vo's, Bates', and Hosseinion's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the

- 6 -

Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current shareholder of Nutex. Plaintiff has continuously held Nutex common stock at all relevant times.

**Nominal Defendant Nutex**

25.     Nominal Defendant Nutex is a Delaware corporation with its principal executive offices at 6030 S. Rice Ave, Suite C, Houston, Texas 77081. Nutex's common stock trades on the Nasdaq Capital Market ("NASDAQ") under ticker symbol "NUTX."

**Defendant Vo**

26.     Defendant Vo has served as the Company's CEO and Chairman of the Board since April 1, 2022. According to the Schedule 14A the Company filed with the SEC on June 2, 2025 (the "2025 Proxy Statement"), as of April 23, 2025, Defendant Vo owned 1,857,879 shares of the Company's Class A common stock. As such, Defendant Vo owned 32.88% of the Company's Class A common stock as of April 23, 2025. Given that the price per share of the Company's Class A common stock at the close of trading on April 23, 2025 was $145.04, Defendant Vo owned approximately $269.5 million worth of Nutex Class A common stock as of that date.

27.     The 2025 Proxy Statement stated the following about Defendant Vo:

Dr. Vo was appointed as the Company's Chief Executive Officer on April 1, 2022 and elected, effective April 1, 2022, as the Chairman of the Board. Since 2010, Dr. Vo has served as the founder and executive officer of affiliates of the Company. Although no longer practicing, Dr. Vo worked as an emergency medicine physician in Houston, Texas, for over twenty years. Since 2008, Dr. Vo has been involved with the opening of over 40 freestanding emergency departments and micro hospitals. Dr. Vo holds a Bachelor of Science in Life Sciences from Kent State University and received his Doctor of Medicine from North East Ohio Universities College of Medicine. In 2004, Dr. Vo also received his Master of Business Administration from Rice University. The Company believes that Dr. Vo's unique background in the emergency hospital field and proven management experience make him well qualified to serve as a director.

**Defendant Bates**

28.     Defendant Bates has served as the Company's CFO since June 30, 2022.

29.     The 2025 Proxy Statement stated the following about Defendant Bates:

Jon C. Bates was appointed as the Company's Chief Financial Officer effective June 30, 2022. From 2006 until June 2022, Mr. Bates served as Vice President of Accounting/Corporate Controller at U.S. Physical Therapy, Inc (NYSE: USPH), one of the largest publicly traded national operators of outpatient physical therapy clinics and provider of industrial injury prevention services. Before joining USPH, Mr. Bates served as Chief Financial Officer and Chief Accounting Officer at Commerciant, L.P., Chief Accounting Officer/Corporate Controller at National Alarm Technologies LLC, Assistant Corporate Controller at American Residential Services, Inc., and a Senior Auditor at Arthur Andersen LLP. His areas of expertise include strategic financial planning, risk assessment & evaluation, Internal Audit/SOX reporting, valuation and deal acquisition, and many more. Mr. Bates is a Certified Public Accountant, holds a Bachelor of Business Administration from University of Texas at Austin and also received his Master of Business Administration from University of Houston. The Company believes that Mr. Bates extensive knowledge of Finance and Accounting, in combination with his experience with public financial reporting with the SEC, makes him a valuable Chief Financial Officer.

**Defendant Hosseinion**

30.    Defendant Hosseinion has served as the Company's President and as a Company director since April 2022. Previously, Defendant Hosseinion served as the CEO of Clinigence Holdings, Inc. (n/k/a Nutex Health, Inc.) from April 2019 to April 1, 2022, and as Chairman of the Clinigence Holdings, Inc.'s board of directors from April 2019 to April 2022.

31.    The 2025 Proxy Statement stated the following about Defendant Hosseinion:

Warren Hosseinion, M.D., is the President and a director of the Company, positions he has held since April 2022. From February 26, 2021 to April 1, 2022, Dr. Hosseinion was Chief Executive Officer of Clinigence Holdings, Inc. (n/k/a Nutex Health Inc.). From April 2019 to April 2022, Dr. Hosseinion served as Chief Executive Officer and Chairman of the board of directors of Clinigence Holdings, Inc. In addition, Dr. Hosseinion has served as the Non-Executive Chairman of the board of directors of Cardio Diagnostics Holdings, Inc. ("Cardio") (NASDAQ: CDIO) since the consummation of its business combination with Mana Capital Acquisition Corp. in October 2022. Cardio was formed to further develop and commercialize a series of products for major types of cardiovascular disease and associated co-morbidities including coronary heart disease, stroke, heart failure and diabetes, by leveraging our proprietary Artificial Intelligence-driven Integrated Genetic-Epigenetic Engine™. Dr. Hosseinion is a Co-Founder of Apollo Medical Holdings, Inc. (Nasdaq: AMEH) ("ApolloMed") and served as a member of the

board of directors of ApolloMed from July 2008 to March 2019, as the Chief Executive Officer of ApolloMed from July 2008 to December 2017, and as the Co-Chief Executive Officer of ApolloMed from December 2017 to March 2019. ApolloMed is a physician-centric, technology-powered, risk-bearing healthcare company with an integrated healthcare delivery platform that enables providers to successfully participate in value-based care arrangements. Dr. Hosseinion received his Bachelor of Science in Biology from the University of San Francisco, his Master of Science in Physiology and Biophysics from the Georgetown University Graduate School of Arts and Sciences, his Doctor of Medicine from the Georgetown University School of Medicine and completed his residency in internal medicine from the Los Angeles County-University of Southern California Medical Center. Dr. Hosseinion's qualifications to serve on our Board include his position as our current President. In addition, Dr. Hosseinion's experience as a physician, along with his background at ApolloMed and Cardio, brings our Board and our Company a depth of understanding of physician culture and the healthcare market, as well as a strong knowledge of the public markets.

**Defendant Creem**

32.     Defendant Creem served as a Company director from April 1, 2022 to July 14, 2025. During the Relevant Period, he served as the Chair of the Audit Committee, as a member of the Compensation Committee, and as a member of the Nominating and Governance Committee.

33.     The Schedule 14A the Company filed with the SEC on May 6, 2024 stated the following about Defendant Creem:

Mitchell Creem, MHA has been a director of the Company since April 1, 2022. Mr. Creem has spent over 35 years as a "C-level" executive of healthcare organizations, and he brings strong business evaluation and operational experience to the Company. Mr. Creem is currently a principal at GreenRock Capital, a firm that provides healthcare and commercial real estate owners with a new form of low-cost capital for development, value-add and recapitalization projects. Since July 2017, Mr. Creem has also served as President of The Bridgewater Healthcare Group, which provides hospital and health system management and performance consulting. From October 2015 to July 2017, Mr. Creem served as the Chief Executive and Administrative Officer of Verity Health System, a six-hospital system in California. Prior to this, he served as the Chief Financial Officer and Board Member of ApolloMed from October 2012 to October 2015. Prior to ApolloMed, he served as the Chief Executive Officer of the Keck Hospital of University of Southern California ("USC") and USC Norris Cancer Center. Prior to his tenure at USC, he served as the Chief Financial Officer and Associate Vice

Chancellor of University of California, Los Angeles ("UCLA") Health Sciences, including UCLA Medical Center, the Geffen School of Medicine at UCLA, and UCLA Faculty Practice. Prior to UCLA, he served as Chief Financial Officer of Beth Israel Deaconess Medical Center, a Harvard University teaching hospital, and Chief Financial Officer of Tufts University Medical Center. Prior to this, he worked for several years in a senior management position at the healthcare practice group of PricewaterhouseCoopers, where he was responsible for numerous consulting engagements, financial statement audits and financial feasibility studies. He has been a guest lecturer at USC, UCLA and Harvard University. Mr. Creem holds a Bachelor of Science in Accounting and Business Administration from Boston University and a Master of Health Administration from Duke University. The Company believes that Mr. Creem's background and experience in healthcare management roles make him well qualified to serve as a director.

**Defendant Grenas**

34.     Defendant Grenas has served as a Company director since April 1, 2022. She also currently serves as the Chair of the Compensation Committee and as a member of the Nominating and Governance Committee.

35.     The 2025 Proxy Statement stated the following about Defendant Grenas:

Cheryl Grenas, R.N., M.S.N. has been a director of the Company since April 1, 2022. Since March 2018, Ms. Grenas has served as the Chief Nursing Officer at Behavioral Hospital of Bellaire. From July 2017 to March 2018, she was a consultant to start-up and existing freestanding emergency departments in the Houston metropolitan area. From August 2015 to July 2017, she was the Regional Facility Director at Neighbors Emergency Center (Free Standing Emergency Departments). Ms. Grenas served in the United States Navy for 20 years, achieved the rank of Lieutenant Commander, and is a veteran of two deployments in support of Operation Iraqi Freedom (2005) and Operation Enduring Freedom (2011). She was awarded two Navy Commendation Medals and four Navy Achievement Medals during her service. Ms. Grenas, holds a Bachelor of Science in Nursing and a Master of Science in nursing from Prairie View A&M University. The Company believes that Ms. Grenas' background and experience in healthcare management roles make her well qualified to serve as a director.

**Defendant Reed**

36.     Defendant Reed has served as a Company director since April 1, 2022. He also currently serves as the Chair of the Nominating and Governance Committee, as a member of the

Audit Committee, and as a member of the Compensation Committee.

37.    The 2025 Proxy Statement stated the following about Defendant Reed:

Michael L. Reed, MPH has been a director of the Company since April 1, 2022. Mr. Reed has been an independent consultant providing advisory services in the areas of emergency medicine, hospitalist medicine, hospital operations, risk-based payor contracts, value-based care, and physician practice operations and development since January of 2018. From January 2019 to January 2020, Mr. Reed was Senior Vice President of Business Development and Strategic Partnerships of the Oncology Institute, a value-based oncology care company. From April 2018 to December 2018, Mr. Reed served as the Chief Executive Officer of Turtle Peak Customer Service, LLC, a Las Vegas, Nevada-based privately-held customer service company. Since August 2017, Mr. Reed has served as Senior Advisor to NueHealth, LLC, based in Leawood, Kansas, a privately-held developer and investor in lower-cost healthcare centers. From July 2009 to October 2013, Mr. Reed was President and Chief Executive Officer of Team Health Hospital Medicine, a division of TeamHealth, a once publicly-traded company that was acquired by Blackstone in 2017. In addition, from December 2001 to November 2004, he served as the Chief Operating Officer of Pinnacle Health System, a health care solutions company providing outpatient, inpatient, claims, billing, and medical management. Mr. Reed holds a Bachelor of Science in Health Services Management from California State University and received his Master of Public Health from UCLA. The Company believes that Mr. Reed's long-standing career as a professional healthcare executive within the emergency medicine system and value-based care make him well qualified to serve as a director.

**Defendant Saunders**

38.    Defendant Saunders has served as a Company director since April 11, 2024. He also currently serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee.

39.    The 2025 Proxy Statement stated the following about Defendant Saunders:

Scott J. Saunders has been an independent director of the Company since April 11, 2024. Mr. Saunders is head of health care advisory services and has been Managing Director of Farlie Turner Gilbert & Co., LLC, a boutique middle market investment bank in Fort Lauderdale, Florida, since 2006. Since 1992, he has served as a financial and strategic advisor to middle market companies across a variety of industries, including companies primarily in the healthcare industry as well as those in financial distress. In addition, he advised companies in the media and communications,

business services, industrial, and consumer products industries. The majority of transactions consummated during this period have been corporate divestitures but have also included debt and equity private placements and buy-side advisory work. He has been a guest lecturer at the University of Florida and Florida International University. In addition, he co-taught a class in management consulting to undergraduates and graduate students in the Management Department at the University of Miami. He is a frequent panelist at industry conferences on topics in healthcare M&A and financing. Throughout his career, he has developed relationships with key representatives of leading middle market private equity and private credit firms, as well as mezzanine capital firms, BDCs, and selected hedge funds. Mr. Saunders received his B.A. degree from Wesleyan University and his MPPM (now designated an MBA) degree from the Yale University School of Management. The Company believes that Mr. Saunders's background and experience in healthcare advisory roles make him well qualified to serve as a director.

**Defendant Spears**

40.    Defendant Spears has served as a Company director since April 1, 2024. Since 2017, Defendant Spears has been a Physician Partner, Chief Medical Director and ED Director at Alexandria Emergency Hospital in Alexandria, LA., an affiliate hospital of the Company.

41.    The 2025 Proxy Statement stated the following about Defendant Spears:

Dr. Kelvin Spears has been a member of the Board since April 1, 2024. Dr. Spears completed his emergency medicine residency followed by a fellowship in Critical Care at Martin Luther King Jr, Charles Richard Drew University Health Sciences, in Los Angeles California. Prior to his residency, he first earned his medical degree from Meharry Medical College. Prior to this, he received a B.S. in Chemistry from Dillard University. Dr. Spears is board certified in Emergency Medicine by the American Board of Emergency Medicine and is a Fellow of the American College of Emergency Physicians. Dr. Spears has been a practicing emergency medicine physician for over 32 years. Since 2017, he has been a Physician Partner, Chief Medical Director and ED Director at Alexandria Emergency Hospital in Alexandria, LA. a hospital affiliate of the Company. Dr. Spears also serves as the EMS Medical Director for Alexandria Fire Department, Pineville Fire Department, Cotile Fire Department, Central Louisiana Bureau EMS, Kisatchie Forest/US Forest Service and Rapides Parish School Additionally, from 2014 to 2017 he served as Emergency Department Director at Christus St. Frances Cabrini Hospital in Alexandria, LA and at Contract Management Group SMD, Envision, Sound, servicing a 45,000 patient per year Emergency Department. Dr. Spears' dedication to providing quality healthcare in the most efficient and effective methods, along with his extensive EMS background and wealth of experience, make him well- qualified to serve as a director.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

43.     Each director and/or officer of the Company owes to Nutex and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

45.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants at Nutex had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management,

earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

47.    To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Nutex's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.     Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

49.     At all times relevant hereto, the Individual Defendants at Nutex were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

50.     Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

51.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance

of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of Nutex's board of directors, each of the Individual Defendants who was a director of Nutex was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company and was at all times acting within the course and scope of such agency.

## NUTEX'S CODE OF ETHICS

57.    Nutex's Code of Ethics applies to "all directors, officers, and employees of the Company." Additionally, the Code of Ethics "is intended to focus all such parties on areas of ethical risk, provide guidance to directors and officers to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability."

58.    Under the heading "Conflict of Interest" the Code of Ethics states the following, in relevant part:

Directors, officers, and employees must avoid any conflicts of interest between the director, officer, or employee, as the case may be, and the Company. Any situation that involves, or may involve, a conflict of interest with the Company, should be disclosed promptly to the Board, which may consult with inside or outside legal counsel as appropriate.

A "conflict of interest" can occur when a director's, officer's, or employee's personal interest is averse to – or may appear to be adverse to – the interests of the Company as a whole. Conflicts of interest also arise when a director, an officer, an employee, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company. For purposes of this Code, "immediate family" includes a person's spouse, parents, children, siblings, mothers and fathers-in-law, sons and daughters-in-law, brothers and sisters-in-law and anyone (other than employees) who share such person's home.

59.     Under the heading "Confidentiality," the Code of Ethics states the following:

Directors, officers, and employees should maintain the confidentiality of information entrusted to them by the Company and any other confidential information about the Company, its business, customers or suppliers that comes to them, from whatever source, in their capacity as a director, officer, or employee, as the case may be, except when disclosure is authorized or legally mandated. For purposes of this Code, "confidential information" includes all non-public information relating to the Company, its business, customers or suppliers.

60.     Under the heading "Compliance with Laws, Rules, and Regulations; Fair Dealing," the Code of Ethics states the following:

Directors, officers, and employees shall comply, and shall oversee policies designed to promote compliance, with all laws, rules and regulations applicable to the Company, including, but not limited to, federal and state securities laws, rules, and regulations, and the rules and regulations of the American Stock Exchange.

Directors, officers, and employees shall endeavor to insure that the Company's public disclosure communications, including filings with the Securities and Exchange Commission, are full, fair, accurate, timely, and understandable, and shall, to the extent part of their job responsibilities, maintain familiarity with the disclosure requirements applicable to the Company. Said parties are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit material facts about the Company to others, whether within or outside the Company.

- 19 -

Directors and officers shall oversee policies designed to promote ethical dealing by employees and officers with the Company's customers, suppliers, competitors and employees.

61.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Ethics, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Ethics.

## NUTEX'S AUDIT COMMITTEE CHARTER

62.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*:

The audit committee is established by and among the board of directors for the primary purpose of assisting the board in:

• Overseeing the integrity of the company's financial processes and financial statement audits
• Overseeing the company's compliance with legal and regulatory requirements
• Overseeing the registered public accounting firm's (independent auditor's) qualifications and independence
• Overseeing the performance of the company's independent auditor and internal audit function
• Overseeing the company's systems of disclosure controls and procedures
• Overseeing the company's internal controls over financial reporting
• Overseeing the company's compliance with ethical standards adopted by

the company

63.     Under the heading "Responsibilities and duties," in the subsection titled "Documents/reports/accounting information review," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

> Review this charter at least annually and recommend any necessary amendments to the board of directors.
>
> Meet with management and the independent auditor to review and discuss the Company's annual financial statements and quarterly financial statements prior to the company's Form 10-K and 10-Q filings or release of earnings, including the company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations*".*
>
> Review internal control reports (or summaries thereof), other relevant reports or financial information submitted by the company to any governmental body, or the public, and relevant reports rendered by the independent auditor (or summaries thereof). Review internal control reports (or summaries thereof), other relevant reports or financial information submitted by the company to any governmental body, or the public, and relevant reports rendered by the independent auditor (or summaries thereof).
>
> Discuss the listed company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including the type and presentation of information, paying particular attention to any pro forma or adjusted non-GAAP information. Such discussions may be in general terms (i.e., discussion of the types of information to be disclosed and the type of presentations to be made).
>
> Review the regular internal reports to management (or summaries thereof) prepared by the internal audit function, as well as Management's response.

64.     Under the same heading, in the subsection titled "Financial reporting processes, accounting policies, and internal control structure," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

> In consultation with the independent auditor and the internal audit function, review the integrity of the Company's internal and external financial reporting processes.

Understand the scope of the audit plan, including the independent auditors' review of internal control over financial reporting. Receive and review any disclosure from the company's CEO and CFO made in connection with the certification of the company's quarterly and annual reports filed with the SEC of: a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize, and report financial data; and b) any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal controls.

Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; major issues as to the adequacy of the company's internal controls; and any special audit steps adopted in light of material control deficiencies.

Review analyses prepared by management and the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

Review the effect of regulatory and accounting initiatives, as well as off-balance-sheet structures, on the financial statements of the company.

Review and approve all related-party transactions, defined as those transactions required to be disclosed under Items 404(a) and (b) of Regulation S-K, NYSE Rule 314.00, and NASDAQ Corporate Governance Rule 5630. Discuss with the independent auditor its evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.

Establish and oversee procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, or auditing matters, including procedures for confidential, anonymous submissions by company employees regarding questionable accounting or auditing matters.

65.     Under the same heading, in the subsection titled "Internal Audit Function," the

Audit Committee Charter states that the responsibilities of the Committee as follows:

Review and advise on the selection and removal of the internal audit director.

Review the activities and organizational structure of the internal audit function, as well as the qualifications of its personnel.

Annually, review and recommend changes (if any) to the internal audit charter. Periodically review, with the internal audit director, any significant difficulties, disagreements with management, or scope restrictions encountered in the course of the functions work.

Periodically review, with the independent auditor, the internal audit functions responsibility, budget, and staffing

66.     Under the same heading, in the subsection titled "Ethical compliance, legal compliance, and risk management," the Audit Committee Charter states that the responsibilities of the Committee are as follows:

Oversee, review, and periodically update the Company's code of business conduct and ethics and the Company's system to monitor compliance with and enforcement of this code.

Review, with the Company's counsel, legal compliance and regulatory matters that could have a significant impact on the company's financial statements.

Discuss policies with respect to risk assessment and risk management, including appropriate guidelines and policies to govern the process, as well as the Company's major financial risk exposures and the steps management has undertaken to control them.

Consider the risk of Management's ability to override the Company's internal controls. Reporting Report regularly to the board regarding the execution of the Audit Committee's duties, responsibilities, and activities, any issues encountered, and related recommendations.

67.     Under the same heading, in the subsection titled "Reporting," the Audit Committee Charter states that the responsibilities of the Committee as follows:

Report regularly to the board regarding the execution of the Audit Committee's duties, responsibilities, and activities, any issues encountered, and related recommendations.

Recommend to the board of directors that the audited financial statements be included in the Company's annual report on Form 10-K.

Provide a report of the audit committee, which contains certain required

disclosures, in the Company's annual proxy.

68.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Company Background

69.    Nutex is a healthcare services and operations company based in Houston, Texas. The Company's operations are reported according to the following three segments: (1) the hospital division; (2) the population health management division ("PHM"); and (3) the real estate division.

70.    The Company's hospital division consists of 24 hospital facilities across 11 states and features a variety of facility models including micro-hospitals, specialty hospitals, and hospital outpatient departments. Nutex contracts with 255 doctors at its various facilities and employs 800 full-time employees. The hospital division generally recognizes revenue for contracts with patients who possess out of network benefits with third-party payors (such as commercial insurance). As such, the Company typically operates as an out-of-network provider.

71.     The Company's PHM division creates and maintains provider networks, namely IPAs. Notably, Nutex operates an IPA in Los Angeles, California which oversees roughly 33,000 patients. The Company has also established IPAs in Houston and South Florida.

72.     The Company's real estate division, or Real Estate Entities, owns the land and buildings which are leased to the Company's hospital entities. As such, the Company does not have direct ownership interest in the Real Estate Entities but in certain cases such entities are owned and controlled by related parties such as the Company's CEO.

**Balance Billing and the NSA**

73.     Prior to the enactment of the NSA in 2022, a patient's healthcare plan generally did not cover the full costs when treated by an out-of-network provider. As such, patients who received treatment from out-of-network providers often faced higher costs than they would if receiving the same treatment from an in-network provider. In addition to facing higher costs, out-of-network providers could bill patients directly for the differential between the full cost of treatment and the amount actually paid by the patient's healthcare plan. This practice is known as "balance billing," and bills received from out-of-network providers are known as "surprise bills."

74.     However, Congress passed the NSA in December 2020, which took effect on January 1, 2022. First, the NSA required private healthcare plans to cover out-of-network claims and apply in-network cost sharing. Second, the NSA prohibited healthcare providers from billing patients a greater amount than the in-network cost sharing charge for surprise medical bills.

75.     In addition to restraining the practice of balance billing, the NSA created an IDR process to settle out-of-network payments between healthcare plans and providers in the event of failed negotiations. Under the IDR process, healthcare plans and providers each submit their own

payment figure supplemented with supporting evidence to an arbitrator. The arbitrator then takes into account the "qualifying payment amount" ("QPA") or the median contract rate in the same geographic area for similar services, along with additional factors such as the level of training. After reviewing the circumstances, QPA, and competing payment figures, the arbitrator selects one of the two proposed amounts.

76.    Given that Nutex primarily operates as an out-of-network provider, the Company's business began to suffer after the enactment of the NSA. As the cost-sharing promulgated under the NSA generally reflects the median in-network healthcare plan rates, the Company could no longer utilize out-of-network billing as a means to generate additional revenue from the services provided to patients.

77.    The Company reflected this new reality in its Annual Report filed with the SEC on March 3, 2023 for the year ended December 31, 2022, which stated that "[s]ince the NSA became effective [. . .] our average payment by insurers of patient claims for emergency services has declined by approximately 30% including as much as a 37% reduction for physician services." The Company further stated that "[i]n our experience, insurers often initially pay amounts lower than the QPA without regard for other information relevant to the claim. This requires us to make appeals using the IDR process."

78.    In order to achieve better results in the IDR process, the Company engaged with HaloMD in July 2024. Notably, the Company did not disclose the identity of its third-party IDR vendor to investors at the time. Over the successive months, the Company began to report increasing success with its new approach to the IDR process. In the press release the Company issued on March 31, 2025 to announce its financial and operational results for the fourth quarter

- 26 -

and full year ended December 31, 2024 (the "4Q/FY 2024 Press Release"), the Company represented that "[t]otal revenue increased $232.3 million to $479.9 million for the year ended December 31, 2024[.]" The 4Q/FY 2024 Press Release further reported that "[t]he arbitration process resulted in approximately 73.1% of the $232.3 million revenue increase."

**False and Misleading Statements**

***August 8, 2024 Press Release***

79.    On August 8, 2024, the Company issued the 2Q 2024 Press Release, which it also filed on Form 8-K with the SEC. The 2Q 2024 Press Release stated, in relevant part:

> "***We are pleased to report 29% revenue growth, Adjusted EBITDA, attributable to Nutex Health Inc. of $12.0 million and a 150% increase in hospital division operating income to $22.8 million in the second quarter ended June 30, 2024, showing our continued focus on top line growth, increasing cash flow as well as improving profitability***," stated [Defendant] Bates[.]

> "***Nutex Health is executing extremely well, and we plan to continue to advance our strategic initiatives to drive sustainable growth***. We delivered solid revenue growth while accelerating cash flow and strengthening our balance sheet in the first half of 2024. ***We are confident that we are taking the right steps to lay the foundation for long-term success and to increasing shareholder value***," stated [Defendant] Hosseinion[.]

> "We had a solid Second Quarter with strong year over year growth. Volume continues to increase overall among our hospitals. ***Our average payment by insurers of patient claims increased, a trend we are optimistic will persist as we continue to work the NSA claims through the [IDR] process***," stated [Defendant] Vo[.]

***August 8, 2024 Form 10-Q***

80.    Also on August 8, 2024, Nutex filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended June 30, 2024 (the "2Q 2024 10-Q"), signed by Defendants Vo and Bates. Attached to the 2Q 2024 10-Q were certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Vo and Bates certifying that the 2Q 2024

10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and

that the "information contained in the [2Q 2024 10-Q] fairly presents, in all material respects, the

financial condition and results of operations of [the Company]."

81.    With respect to the Company's financial condition and operational results, the 2Q

2024 10-Q stated the following, in relevant part:

> On July 1, 2024, we engaged with a third-party IDR vendor ***to further support all of our out of network claims and determine which claims would be beneficial to arbitrate***. The IDR arbitration process can take up to four to six months to receive payments. Based on the available data we have analyzed from the third and fourth quarters of 2023, providers have submitted higher offers and have prevailed 80% of the time through IDR.

82.    With respect to the Nutex's controls and procedures, the 2Q 2024 10-Q noted that

the Company had "[i]neffective design, implementation, and operation controls over logical

access, program change management, and vendor management controls," that "[b]usiness process

controls across all financial reporting processes were not effectively designed and implemented to

properly address the risk of material misstatement, including controls without proper segregation

of duties between preparer and reviewer and key management review controls," and "[i]neffective

design and implementation of controls over the completeness and accuracy of information

included in key spreadsheets supporting the financial statements."

83.    With respect to the Company's supposed efforts to remediate the weaknesses

referenced and identified in the paragraph above, the 2Q 2024 10-Q stated, in relevant part:

> *Remediation Plans*. These material weaknesses did not result in a material misstatement of the Company's consolidated financial statements for the periods presented. In 2024, the Company started the process of designing and implementing effective internal control measures to remediate the reported material weaknesses. The Company's efforts included implementing a new enterprise-wide system to reduce reliance on manual processes and spreadsheets supporting the financial statements. Additionally, the Company engaged an accounting firm in 2024 to

- 28 -

assist in the proper design, implementation and testing of internal controls over financial reporting. We made additions to our accounting and financial reporting teams throughout 2024.

***August 9, 2024 Earnings Call***

84.    On August 9, 2024, the Company hosted an earnings call to discuss its financial and operational results for the second quarter of 2024 with investors and analysts (the "2Q 2024 Earnings Call"). During the 2Q 2024 Earnings Call, Defendant Vo stated the following, in relevant part:

> We have also already begun to engage in the arbitration process of the independent dispute resolution, whereas previously we had stopped at the open negotiation process. ***We believe that there is a lot of potential incremental value and revenue to be gained from arbitration as we believe that the insurers typically pay us very low the first time***. Arbitration is a tool provided by the No Surprises Act to ensure providers receive fair treatment. In recent articles and public data, we are seeing that providers are prevailing 70% to 80% of the time in arbitration.

***November 7, 2024 Press Release***

85.    On November 7, 2024, the Company issued a press release concerning its financial and operational results for the third quarter of 2024, which it also filed on Form 8-K with the SEC (the "3Q 2024 Press Release"). The 3Q 2024 Press Release stated the following, in relevant part:

> "We are pleased to report 25% revenue growth, Adjusted EBITDA attributable to Nutex Health of $13.5 million and a 209% increase in gross profit to $21.9 million in the third quarter ended September 30, 2024, ***showing our continued focus on top line growth, increasing cash flow as well as improving profitability***," stated [Defendant] Bates[.]

> "Nutex Health had another outstanding quarter. The strategic and operational decisions we have made over the last nine months are driving this strong performance, as demonstrated by another quarter of year-over-year growth in revenue, EBITDA and Adjusted EBITDA as well as incremental growth in cash flow. ***We are confident that our momentum will continue and plan on growing our hospital and population health divisions responsibly as we drive value for our shareholders***," stated [Defendant] Hosseinion[.]

"The four de-novo hospitals that we opened in 2023 are ramping up nicely, resulting in strong year-over-year growth in both revenue and patient volume. Volumes and revenue continue to increase among our mature hospitals, both on the outpatient side as well as the inpatient side, which still have excess capacity. ***Our average payment by insurers of patient claims also increased, a trend we are optimistic will persist as we continue to work the NSA [] claims through the [IDR] process***," stated [Defendant] Vo[.]

***November 7, 2024 Form 10-Q***

86.     Also on November 7, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2024 (the "3Q 2024 10-Q"), signed by Defendants Vo and Bates. Attached to the 3Q 2024 10-Q were SOX certifications signed by Defendants Vo and Bates certifying that the 3Q 2024 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [3Q 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

87.     The 3Q 2024 10-Q conveyed substantively similar information concerning Nutex's relationship with its third-party IDR vendor referenced and identified, *supra*, in ¶ 81.

88.     Additionally, the 3Q 2024 10-Q conveyed substantively similar information concerning the Company's identified material weaknesses in internal control over financial reporting referenced and identified, *supra*, in ¶ 82.

***November 8, 2024 Earnings Call***

89.     On November 8, 2024, the Company hosted an earnings call to discuss its financial and operational results for the third quarter of 2024 with investors and analysts (the "3Q 2024 Earnings Call"). During the 3Q 2024 Earnings Call, Defendant Vo stated the following, in relevant part:

We are pleased to report another excellent quarter for Nutex Health. In the third quarter of 2024, [] we achieved substantial revenue growth as well as volume growth and continue to show our commitment to enhancing profitability and operational efficiency. I would like to start with some highlights from this quarter. For the three months ended September 30, 2024, we reported total revenue of $78.8 million which is a significant increase compared to $62.7 million for the same period last year. This equates to a growth of 26%.

\*\*\*

[O]ur internal coding, billing and collections department, operationally, are getting more experience in working the No Surprises Act or NSA claims. Adapting to specific nuances and solving complex problems in dealing with insurers post NSA. As a result, we are seeing better reimbursement per patient.

\*\*\*

We continually strive to obtain fair in-network contract with insurers. If this is not possible, we make serious attempts to get a fair qualified payment amount or QPA from the insurers. If we do not get a fair QPA as described in the NSA bylaws, the first time, we proceed with the independent dispute resolution or IDR which includes both the open negotiation as well as arbitration process options.

### *February 5, 2025 Press Release*

90.     On February 5, 2025, the Company issued a press release titled "Nutex Health Issues No Surprises Act (NSA) Arbitration Update" (the "NSA Press Release"), which it also filed on Form 8-K with the SEC. The NSA Press Release stated, in relevant part:

Nutex [. . .] today provided an update regarding its strategic participation in arbitration known as the [IDR] process under the [NSA].

As previously disclosed in our September 30, 2024 Form 10-Q, on July 1, 2024 the Company contracted with a third-party vendor to assist in the recovery of certain out of network claims under the arbitration process. ***Since implementing its arbitration strategy, the Company has reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the fourth quarter of 2024***.

***These increasingly favorable outcomes are expected to allow the Company to recover substantial amounts previously underpaid by insurers. Due to significant administrative time built into the federal arbitration process and delays in***

- 31 -

*collections, the Company is now beginning to realize the full cash impact of its enhanced arbitration process that was commenced in July 2024*.

\*\*\*

"*Our proactive approach to arbitration under the No Surprises Act has yielded positive results thus far, reinforcing our commitment to fair reimbursement. By effectively leveraging our industry leading expertise and knowledge, we have been able to secure rightful payments for our facilities and providers while continuing to deliver high-quality, accessible care to our communities*," stated [Defendant] Vo[.] "The momentum we have built in 2024 places Nutex Health in a strong position for continued success in the coming year."

### March 31, 2025 Press Release

91.     On March 31, 2025, the Company issued 4Q/FY 2024 Press Release to announce its financial and operational results for the fourth quarter and full year 2024, which it also filed on Form 8-K with the SEC. The 4Q/FY 2024 Press Release stated, in relevant part:

> • The arbitration process resulted in approximately $169.7 million more in revenue in 2024 than in 2023, which amounted to approximately 73.1% of the $232.3 million revenue increase. Of the $169.7 million in arbitration revenue, $68.9 million, $70.5 million and $30.3 million related to dates of services for the fourth quarter 2024, third quarter 2024 and pre-third quarter 2024, respectively.

\*\*\*

"Nutex Health delivered healthy year-end and fourth quarter financial and operational results last year. *The arbitration initiative that we began in July 2024 is generating higher reimbursement amounts per visit this year and is more in line with a fair market rate*. We would like to thank our dedicated teams of physicians, nurses and all our other team members for continuing to deliver for our patients. We enter 2025 with great momentum and look forward to continuing our strong financial and operational performance," stated [Defendant] Vo[.]

### March 31, 2025 Form 10-K

92.     Also on March 31, 2025, the Company filed its Annual Report on Form 10-K with the SEC for the year ended December 31, 2024 (the "2024 10-K"), signed by Defendants Vo, Bates, Hosseinion, Creem, Grenas, Reed, Saunders, and Spears. Attached to the 2024 10-K were

SOX certifications signed by Defendants Vo and Bates certifying that the 2024 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

93.    With respect to governmental regulation, the 2024 10-K stated:

*Nutex and the NSA*. While we are working within the established processes for IDR, we have had varying successes at achieving collections at or higher than the established QPA. We have undertaken several strategic actions designed to improve our collections results. These include:

- ***engaging a third-party IDR vendor for claims under IDR***,
- maximizing our claims coding efficiency,
- increasing efforts to collect co-pays and co-insurance,
- adding additional administrative staff to handle the increased administrative
IDR burden,
- ***having a dedicated IDR team to accelerate resubmission of claims under the IDR process***,
- making appeals for additional payment of claims for periods before and after the NSA final rule was adopted through the IDR process,
- ***making efforts to sign favorable contracts with new insurers***,
- ***working to sign more favorable contracted rates with existing contracted providers***,
- ***working with both local and national legislatures to enforce the NSA rules***
***and guidelines for Insurers***, and
- focusing on the value-based [independent physician associations] side of our business, which is less affected by the NSA.

*Arbitration Process*. On July 1, 2024, we engaged with a third-party IDR vendor to assist in the recovery of certain out of network claims under the IDR process. The IDR process, including subsequent appeals and insurance payor delays, require extensive administrative time and delays in collections, which can take up to three to five months to receive payments from when we start the open negotiation process. ***Since implementing its arbitration strategy, the Company has reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the fourth quarter of 2024***.

94.     Moreover, the 2024 10-K conveyed substantively similar statements concerning identified material weaknesses in the Company's internal control over financial reporting and the Company's remediation efforts referenced and identified, *supra*, in ¶¶ 81-82.

**April 1, 2025 Earnings Call**

95.     On April 1, 2025, the Company hosted an earnings call to discuss its financial and operational results for the fourth quarter of 2024 with investors and analysts (the "4Q 2024 Earnings Call"). During the 4Q 2024 Earnings Call, Defendant Vo stated, in relevant part:

> Now let's turn to a critical piece of our 2024 story. The No Surprises Act or the NSA. And the arbitration process, otherwise known as Independent Dispute Resolution Process or IDR. The NSA effective January 1, 2022, aimed to shield patients from surprise medical bills. A noble intent we fully support and fully adhere to. However, the flawed implementation of the NSA has hit providers like us very, very hard, and specifically on the revenue per patient reimbursement side. In 2022, our average insurer payments for emergency services dropped roughly 30%. The root issue is that insurers often pay below the qualifying payment amount or QPA, which was described and mandated in the NSA.
>
> ***
>
> Since we have implemented the arbitration process, the results have been positive. As I mentioned earlier, while our volume -- our patient volume increased by about 30% in 2024 compared to 2023, our revenue increased by about 94%. And some of this, as a result -- some of this was a result of higher patient volume and acuity to our facility, but a lot of it also was directly from our arbitration initiative.
>
> Since 2024, we have submitted roughly between 60% to 70% of our billable visits to the IDR or arbitration portal. Of these claims submitted, we have achieved a roughly 80% win rate. Of these over 80% plus arbitration wins once again, which are binding, we expect the insurers to pay 60% to 70% in the first 60 days and the rest later.
>
> In terms of revenue per visit increase from the IDR process, we typically find a 150% to 250% increase in reimbursement on the facility collection side compared to the initial payment. And once again, this is all consistent with the public data and consistent with the data that are published by other providers that are also doing arbitration like we are. Once again, the goal of arbitration really is just to get to the QPA payment level as outlined in the No Surprises Act. And so far, arbitration

seems to be working as it was designed to do.

***May 13, 2025 Press Release***

96.    On May 13, 2025, the Company issued a press release announcing its financial and

operational results for the first quarter of 2025, which it also filed on Form 8-K with the SEC (the

"1Q 2025 Press Release"). The 1Q 2025 Press Release stated the following, in relevant part:

> "We are excited to provide yet another solid quarter with $14.6 million in net
> income, a record high gross profit of 56%, a record high $51.0 million in net cash
> from operating activities and a record high cash balance of $87.7 million,
> highlighting the company's continued financial strength as we execute on our
> growth plan for 2025," stated [Defendant] Bates[.]
>
> ***
>
> "The great momentum that we started in 2024 is continuing into the first quarter of
> 2025. ***We are now seeing more consistent financial results stemming from a
> combination of volume growth and operational efficiency, with more fair and
> reasonable payments from the arbitration process***. We still have a lot of work
> ahead of us, but the positive trend is very encouraging. We would like to thank our
> team of physicians and team members nationwide for working in alignment to get
> us to where we are this quarter," stated [Defendant] Vo[.]

***May 13, 2025 Form 10-Q***

97.    On May 13, 2025, the Company filed its quarterly report on Form 10-Q with the

SEC for the quarter ended March 31, 2025, signed by Defendants Vo and Bates (the "1Q 2025 10-

Q"). Attached to the 1Q 2025 10-Q were SOX certifications signed by Defendants Vo and Bates

certifying that the 1Q 2025 10-Q "fully complies with the requirements of Section 13(a) or 15(d)

of the [Exchange Act]" and that the "information contained in the [1Q 2025 10-Q] fairly presents,

in all material respects, the financial condition and results of operations of [the Company]."

98.    The 1Q 2025 10-Q conveyed substantively similar information concerning Nutex's

relationship with its third-party IDR vendor referenced and identified, *supra*, in ¶ 81.

99.    Additionally, the 1Q 2025 10-Q conveyed substantively similar information concerning the Company's identified material weaknesses in internal control over financial reporting referenced and identified, *supra*, in ¶ 82.

***May 14, 2025 Earnings Call***

100.    On May 14, 2025, the Company hosted an earnings call to discuss its financial and operational results for the first quarter of 2025 with investors and analysts (the "1Q 2025 Earnings Call"). During the 1Q 2025 Earnings Call, Defendant Vo stated the following, in relevant part:

> Let me take a few moments to discuss the arbitration process that we first implemented in July of 2024. Overall, it is a small but very important part of our operation. In the first quarter of 2025, we submitted between 60% to 70% of billable visits through the arbitration portal. We achieved an 80% plus win rate of these emissions, resulting in facility collections [. . .] increasing by between 200% to 300% compared to the initial insurance payments. This means that an independent arbitrator has legally determined that the insurance companies are paying us initial payments that are much lower than fair and reasonable rates over 50% of the time. So far, even with these winning percentages, we have not seen any significant behavioral changes. We are constantly monitoring legislative and legal developments at both [Center for Medicare & Medicaid Services ("CMS")] and in Congress, to make sure we are on top of any potential changes.

101.    The statements in ¶¶79-100 above were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company engaged HaloMD to serve as its IDR vendor; (2) HaloMD engaged in fraudulent conduct to achieve substantial arbitration results for Nutex; (3) the revenue generated through the engagement of HaloMD was unsustainable; (4) the Company failed to maintain internal controls, particularly regarding its financial reporting; (5) the Company overstated its ability to remediate such failure to maintain internal controls; (6) on account of such failure to maintain internal controls, the Company improperly calculated particular stock based compensation obligations by treating such obligations as equity as opposed to liabilities; (7) as a result of the foregoing, the Company would be substantially less likely to timely

file its reports with the SEC. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**2025 Proxy Statement**

102.    On June 2, 2025, Nutex filed the 2025 Proxy Statement with the SEC. Defendants Vo, Hosseinion, Creem, Grenas, Reed, Saunders, and Spears solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

103.    The 2025 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Vo, Hosseinion, Grenas, Reed, Saunders, and Spears to the Board; (2) the election of non-party Frank E. Jaumot ("Jaumot") to the Board; (3) executive compensation for the Company's named executive officers; (4) an amendment (the "2025 Amendment to the 2023 Plan") to the 2023 Equity Incentive Plan (the "2023 Plan") to increase the number of shares available; and (5) the ratification of the appointment of Grant Thorton LLP as the Company's independent registered public accounting firm for the year ending December 31, 2025.

104.    The 2025 Proxy Statement states that the 2025 Amendment to the 2023 Plan would increase the amount of shares available under the 2023 Plan by 1.1 million shares. As of May 16, 2025, there were 6,620 shares available for distribution under the 2023 Plan. The 2025 Proxy Statement states that without approval of the 2025 Amendment to the 2023 Plan, the 2023 Plan would continue to be administered in its current form. The 2025 Proxy Statement also states that the Company's "executive officers and directors have an interest in this proposal because they are eligible to receive equity awards under the 2023 Plan."

105.    With respect to the "Board's Role in Risk Oversight," the 2025 Proxy Statement

stated the following:

> Our Board has responsibility for the oversight of the Company's risk management processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, the potential impact of these risks on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from Board committees and members of senior management to enable our Board to understand the Company's risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including the Company's corporate strategy, business objectives, compliance, financial condition, legal, regulatory, commercial and reputational risk. The committees of the Board execute their risk oversight responsibility for risk management as follows:

> (1)    The Audit Committee reviews information regarding liquidity and operations and oversees our management of financial risks as well as risks associated with cybersecurity. Periodically, the Audit Committee reviews our policies with respect to risk assessment, risk management, loss prevention and financial-related regulatory compliance. Oversight by the Audit Committee includes direct communication with our internal and external auditors, and discussions with management regarding significant risk exposures and the actions management has taken to limit, monitor or control such exposures.
> (2)    The Compensation Committee is responsible for the design and oversight of our executive compensation philosophy, policies, plans and practices, including ensuring that our overall executive compensation program appropriately links pay to performance and aligns the interests of our executives with our stockholders and that the elements of our compensation programs mitigate excessive risk-taking.
> (3)    The Nominating and Governance Committee manages risks associated with the independence of members of our Board, corporate disclosure practices, potential conflicts of interest, and corporate responsibility and sustainability efforts, including the impact of ESG issues. The Nominating and Governance Committee also provides oversight of our non-financial compliance program by monitoring our compliance policies, standards, procedures, systems and initiatives as well as oversight of our quality, regulatory and commercial compliance programs.

> While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks. Matters of significant risk are considered by our Board as a whole.

106.    Regarding the Code of Ethics, the 2025 Proxy Statement stated the following:

> Our Board has adopted a Code of Business Ethics Policy to assist the Board in the exercise of its responsibilities and to serve as a framework for the effective

governance of the Company. You can access our current committee charters, our Code of Business Ethics Policy in the "Governance" section of the "Investors" page of our web site located at https://www.nutexhealth.com/governance-documents/.

107.     Under the direction and watch of Defendants Vo, Hosseinion, Creem, Grenas, Reed, Saunders, and Spears, the 2025 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (1) The Company engaged HaloMD to serve as its IDR vendor; (2) HaloMD engaged in fraudulent conduct to achieve substantial arbitration results for Nutex; (3) the revenue generated through the engagement of HaloMD was unsustainable; (4) the Company failed to maintain internal controls, particularly regarding its financial reporting; (5) the Company overstated its ability to remediate such failure to maintain internal controls; (6) on account of such failure to maintain internal controls, the Company improperly calculated particular stock based compensation obligations by treating such obligations as equity as opposed to liabilities; (7) as a result of the Company's engagement of HaloMD and failure to maintain internal controls, the Company would be substantially less likely to timely file its reports with the SEC. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

108.     The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

109.     As a result of Defendants Vo, Hosseinion, Creem, Grenas, Reed, Saunders, and

Spears causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted to approve, *inter alia*, (1) the re-election of Defendants Vo, Hosseinion, Grenas, Reed, Saunders, and Spears to the Board, thereby allowing him to continue breaching their fiduciary duties to the Company; (2) the election of non-party Frank E. Jaumot ("Jaumot") to the Board; (3) executive compensation for the Company's named executive officers; (4) 2025 Amendment to the 2023 Plan; and (5) the ratification of the appointment of Grant Thorton LLP as the Company's independent registered public accounting firm for the year ending December 31, 2025.

### The Truth Starts Emerging While and Misleading Statements Continue

#### July 22, 2025 Blue Orca Report

110.    The truth began to emerge on July 22, 2025, when Blue Orca issued the Blue Orca Report on the Company regarding its relationship with HaloMD. Most notably, Blue Orca alleged that "HaloMD achieved dramatically lucrative results for clients like Nutex by engaging in a coordinated fraudulent scheme to steal millions of dollars from insurance companies on behalf of and in conjunction with its healthcare billing clients." As such, Blue Orca reported that "it may just be a matter of time before another suit is filed against HaloMD, this time including Nutex," and added that "[o]nce Nutex can no longer use the NSA arbitration system to receive unsustainably high reimbursement rates, our suspicion is that Nutex will return to penny stock status."

111.    The Blue Orca Report first noted that the NSA had significantly impacted Nutex's ability to generate revenue, stating that "[t]he crackdown on surprise billing resulted in Nutex reporting large operating and net losses in 2022 and 2023, leading its market cap to plunge to less than $30 million[.]" Blue Orca then discussed how HaloMD "[m]iraculously [t]ransformed" the

Company's business, as following the hiring of its "undisclosed 'third party IDR vendor,'" "Nutex's hospital division reported nearly 250% sequential revenue growth in Q4 2024. In a single quarter, Nutex's corporate EBIT margin grew from 12% to 44%. This dramatic change led to Nutex stock appreciating more than 20x from its lows."

112.    Blue Orca went on its report to state that "[t]o [Blue Orca's] knowledge, Nutex does not disclose the identity of this vendor in any of the filings and conference calls," but "[f]or each of Nutex's hospitals that filed arbitrations in Q4 2024, in all but one the email domain was identified as 'halomd.com.'" The Blue Orca Report included the following image noting such email domains:

| DLI Number | Payment Determination Outcome | Provider/Facility Name | Provider Email Domain | Health Plan/Issuer Name | Provider/Facility Offer as % of QPA | Health Plan/Issuer Offer as % of QPA | Prevailing Party Offer as % of QPA |
|---|---|---|---|---|---|---|---|
| DLI - 4778941 | In Favor of Provider/ | WEST PLANO EP | halomd.com | AETNA | 1,311% | 100% | 1,311% |
| DLI - 4741597 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 874% | N/A | 874% |
| DLI - 4724114 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,404% | 100% | 1,404% |
| DLI - 4724115 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 2,029% | 118% | 2,029% |
| DLI - 4733740 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,252% | N/A | 1,252% |
| DLI - 4730135 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 813% | 154% | 813% |
| DLI - 4730136 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,084% | 124% | 1,084% |
| DLI - 4783267 | In Favor of Provider/ | WEST PLANO EP | halomd.com | AETNA | 1,311% | N/A | 1,311% |
| DLI - 4731913 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,598% | N/A | 1,598% |
| DLI - 4741601 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,354% | N/A | 1,354% |
| DLI - 4731920 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,354% | 114% | 1,354% |
| DLI - 4721689 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 2,029% | 164% | 2,029% |
| DLI - 4722849 | In Favor of Provider/ | WEST PLANO EP | halomd.com | UMR | 1,244% | 105% | 1,244% |
| DLI - 4876708 | In Favor of Provider/ | WEST PLANO EP | halomd.com | Cigna | 2,453% | 346% | 2,453% |
| DLI - 4722762 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,354% | 155% | 1,354% |

113.    The Blue Orca Report also reported on three recent "[b]ombshell [l]awsuits" filed against HaloMD. Several insurance companies, including Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield, and Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California d/b/a Anthem Blue Cross have filed suit alleging that HaloMD submitted false attestations of eligibility

and introduced an inordinate number of IDR disputes in contradiction of state and federal law. More specifically, the plaintiffs in the lawsuits against HaloMD allege "HaloMD and its healthcare services clients of stealing tens [of] millions of dollars from insurers by flooding the arbitration system with thousands of claims that they knew at the time of submission to be ineligible." The Blue Orca Report also portrayed this through a graphic utilized in one of the lawsuits referenced above:



Source: Case: 1:25-cv-00388-MWM Document 1, Filed in June 2025

114.    The Blue Orca Report further stated that the plaintiffs in the lawsuits referenced above allege that HaloMD was able to "garner tens of millions of dollars improper payments by **falsely attesting to the eligibility of claims and by improperly inflating payment offers that far exceeded the amounts to which providers should have been entitled**," and, in one of the lawsuits, "plaintiffs allege that HaloMD circumvented the attestation guard rails of the arbitration submission system by simply **fabricating evidence.**" (Emphasis in original). In addition, the Blue

Orca Report stated that "**[t]hese stunning allegations estimate that approximately 50%-70% of the disputes on which defendants submitted arbitrations and received determinations were ineligible,** and that even on eligible claims, HaloMD inflated the value of services to allegedly steal ill gotten money from insurers." (Emphasis in original).

115.    The Blue Orca Report also conveyed its concern for the implications of HaloMD's ongoing legal disputes on Nutex. Blue Orca stated that "[a]lthough it is important to note that Nutex was not named in any of these suits, and to date no insurer has alleged that Nutex has done anything wrong, *we believe these lawsuits are the first of what may be a tidal wave of litigation against HaloMD and its clients, and it may only be a matter of time before Nutex itself is targeted.*" Blue Orca added that "CMS data shows that Nutex was a major HaloMD client (with around 14,000 arbitration line items in Q4 2024, ~66% of which were against Blue Cross Blue Shield affiliates) and that HaloMD achieved remarkable results in arbitration proceedings on behalf of Nutex."

116.    The Blue Orca Report continued by noting that "[n]ot only will this be costly." "but insurers are demanding punitive damages and a **clawback** of improperly paid awards. **In such a case, Nutex may be at risk to have to repay revenue already recognized and collected.**" (Emphasis in original). Even in the event that the Company is not subject to litigation on account of its relationship with HaloMD, Blue Orca stated that it "believe[s] that the lawsuits against HaloMD will likely put an end to the aggressive and massively lucrative strategy employed on behalf of clients like Nutex" and "[w]ithout HaloMD and its special sauce, used to achieve awards 8x greater than QPA, Nutex's financials would be devastated as revenue and profitability shrink back to pre-HaloMD times."

117.    In addition to the ongoing litigation surrounding HaloMD, the Blue Orca Report noted a recent decision arising from the U.S. Court of Appeals for the Fifth Circuit which held that providers could not sue to enforce NSA arbitration awards as such awards are not enforceable under the Federal Arbitration Act. As such, the Blue Orca Report represented that such precedent presents a major risk that a sizeable portion of the Company's recognized revenue may be uncollectable. More specifically, Blue Orca stated in its report that "Nutex's revenue and profitability critically depend on the collectability of the arbitration awards" but, in light of the Fifth Circuit's ruling, "many healthcare insurers may simply refuse to pay NSA arbitration awards." Moreover, Blue Orca noted that the Company may be especially at risk given it has a "massive receivables balance of uncollected awards," citing "that even Nutex's former auditor Marcum LLP noted a critical audit matter around revenue recognition in Nutex's hospital division, which in turn depends upon the collectability of arbitration awards."

118.    In light of the information referenced and identified above, Blue Orca stated that "[i]f Nutex ceases being able to rely on HaloMD to achieve remarkable results using the NSA arbitration process, our suspicion is that Nutex may rapidly return to penny stock status, where it languished before it hired HaloMD. Either way, we do not see how Nutex is investible."

119.    On this news, the price per share of Nutex's stock fell $11.18, or roughly 10.1%, from a closing price of $111.19 per share on July 21, 2025 to close at a price of $100.01 per share on July 22, 2025.

***July 24, 2025 Press Release***

120.    On July 24, 2025, the Company issued a press release in response to the Blue Orca Report, stating that it "strongly disagrees with the allegations in the report" and that it "expects to

provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of 2025 due on or before August 14, 2025.

121.    The statements above above were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company engaged HaloMD to serve as its IDR vendor; (2) HaloMD engaged in fraudulent conduct to achieve substantial arbitration results for Nutex; (3) the revenue generated through the engagement of HaloMD was unsustainable; (4) the Company failed to maintain internal controls, particularly regarding its financial reporting; (5) the Company overstated its ability to remediate such failure to maintain internal controls; (6) on account of such failure to maintain internal controls, the Company improperly calculated particular stock based compensation obligations by treating such obligations as equity as opposed to liabilities; (7) as a result of the foregoing, the Company would be substantially less likely to timely file its reports with the SEC. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### The Truth Fully Emerges

#### *August 14, 2025 Press Release*

122.    The truth fully emerged when, on August 14, 2025, after the market closed, Nutex issued a press release to announce a delay in the filing of its financial statements for the second quarter of 2025. The press release stated, in relevant part:

> Nutex [. . .] today announced that it will ***delay filing its Form 10-Q for the period ending June 30, 2025 due to non-cash accounting adjustments related to the treatment of stock based compensation obligations for certain underconstruction and ramping hospitals, as disclosed in previous filings***. The Company additionally provided preliminary financial results for the three and six months ended June 30, 2025 and announced a stock repurchase program of up to $25.0 million.

\*\*\*

- 45 -

The Company provided select preliminary unaudited financial results for the three and six months ended June 30, 2025. The preliminary financial information presented below reflects management's current views with respect to the Company's financial results. These preliminary results remain subject to the completion of normal quarter-end and fiscal-end accounting procedures and closing adjustments. Nutex Health will release its full financial results as promptly as reasonably practicable.

***The Company hereby announces the cancellation of the conference call that was originally scheduled Friday, August 15, 2025, at 10:30 a.m. ET***. The Company will reschedule the conference call as soon as possible where it will discuss 2nd Quarter financials as well as other topics relevant to the Company.

123.    On this news, the price per share of Nutex's stock fell $18.22, or roughly 16.4%, from a closing price of $111.13 on August 14, 2025 to close at $92.91 per share on August 15, 2025.

<u>**SUBSEQUENT DEVELOPMENTS**</u>

124.    On August 21, 2025, the Company filed a Current Report on Form 8-K with the SEC which included, *inter alia*, a Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard. More specifically, the report stated that the Audit Committee determined that certain of the Company's previously issued financial statements "treated non-cash obligations related to under-construction and ramping hospitals as equity rather than liabilities and should be restated." In addition, the report touched on the allegations set forth by Blue Orca but failed to substantively refute the claims made. Instead, the Company conveyed a broad overview of the NSA's arbitration process and its own claims process, acknowledged the Company's relationship with HaloMD, and noted several of the lawsuits filed against HaloMD while highlighting the Company's absence from the actions.

<u>**DAMAGES TO NUTEX**</u>

125.    As a direct and proximate result of the Individual Defendants' conduct, Nutex has lost and expended, and will continue to lose and expend, many millions of dollars.

126.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

127.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

128.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

129.    As a direct and proximate result of the Individual Defendants' conduct, Nutex has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

130.    Plaintiff brings this action derivatively and for the benefit of Nutex to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Nutex, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

131.    Nutex is named solely as a nominal party in this action. This is not a collusive action

to confer jurisdiction on this Court that it would not otherwise have.

132.    Plaintiff is, and has been at all relevant times, a shareholder of Nutex. Plaintiff will adequately and fairly represent the interests of Nutex in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## **DEMAND FUTILITY**

133.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

134.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following seven individuals: Defendants Vo, Hosseinion, Grenas, Reed, Saunders, Spears (the "Director-Defendants") and non-party Jaumot (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors.

135.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

136.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the

Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

137.    In addition, the Director-Defendants caused the 2025 Proxy Statement to call for a shareholder vote to approve the 2025 Amendment to the 2023 Plan, which increased the amount of shares available by 1.1 million shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2025 Amendment to the 2023 Plan, which they would not have approved had they been informed about the Individual Defendants' misconduct. Prior to the Company's 2025 Annual Meeting of the Stockholders, as of May 16, 2025, there were 6,620 shares available for distribution under the 2023 Plan. After the shareholders voted to approve the 2025 Amendment to the 2023 Plan, there were an additional 1.1 million shares available for issuance under the 2025 Amendment to the 2023 Plan. Thus, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2025 Proxy Statement. For these reasons too, demand on the Director-Defendants is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Vo is futile follow. Defendant Vo is the Company's founder and has served as Nutex's CEO and Chairman of the Board since April 1, 2022. The Company provides Defendant Vo with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, Defendant Vo is a non-independent director. As Nutex's CEO and as one of its trusted directors, Defendant Vo was ultimately responsible for all of the false and misleading statements and omissions that were made by or on

behalf of the Company during the Relevant Period, including those which he personally signed such as the Company's Forms 10-Q, the 2024 10-K, and the associated SOX certifications. As a trusted Company director and the Company's highest officer, Defendant Vo conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Vo solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Hosseinion, Grenas, Reed, Saunders, Spears, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to Nutex. Additionally, Defendant Vo, as a Company director, benefits materially from the increased number of shares made available for payment under the 2025 Amendment to the 2023 Plan which stockholders approved on the basis of the materially false and/or misleading 2025 Proxy Statement. Moreover, Defendant Vo is named as a defendant in the Securities Class Action. For these reasons, Defendant Vo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Hosseinion is futile follow. Defendant Hosseinion has served as the Company's President and as a Company director since April 2022. Previously, Defendant Hosseinion served as the CEO of Clinigence Holdings, Inc. (n/k/a Nutex Health, Inc.) from April 2019 to April 1, 2022, and as Chairman of the Clinigence Holdings, Inc.'s board of directors from April 2019 to April 2022. The Company provides Defendant Hosseinion with his principal occupation for which he receive lucrative compensation.

Thus, as the Company admits, Defendant Hosseinion is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Hosseinion signed the 2024 10-K, which contained false and misleading statements, and solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Vo, Grenas, Reed, Saunders, Spears, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to Nutex. Additionally, Defendant Hosseinion, as a Company director, benefits materially from the increased number of shares made available for payment under the 2025 Amendment to the 2023 Plan which stockholders approved on the basis of the materially false and/or misleading 2025 Proxy Statement. Moreover, Defendant Hosseinion is named as a defendant in the Securities Class Action. For these reasons, Defendant Hosseinion breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.    Additional reasons that demand on Defendant Grenas is futile follow. Defendant Grenas has served as a Company director since April 1, 2022. She also currently serves as the Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. Defendant Grenas has received and continues to receive lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and

consciously disregarded her duties to protect corporate assets. In addition, Defendant Grenas signed the 2024 10-K, which contained false and misleading statements, and solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Vo, Hosseinion, Reed, Saunders, Spears, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to Nutex. Additionally, Defendant Grenas, as a Company director, benefits materially from the increased number of shares made available for payment under the 2025 Amendment to the 2023 Plan which stockholders approved on the basis of the materially false and/or misleading 2025 Proxy Statement. For these reasons, Defendant Grenas breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Reed is futile follow. Defendant Reed has served as a Company director since April 1, 2022. He also currently serves as the Chair of the Nominating and Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee. Defendant Reed has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Reed signed the 2024 10-K, which contained false and misleading statements, and solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Vo, Hosseinion, Grenas, Saunders, Spears, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to

Nutex. Additionally, Defendant Reed, as a Company director, benefits materially from the increased number of shares made available for payment under the 2025 Amendment to the 2023 Plan which stockholders approved on the basis of the materially false and/or misleading 2025 Proxy Statement. For these reasons, Defendant Reed breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Saunders is futile follow. Defendant Saunders has served as a Company director since April 11, 2024. He also currently serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee. Defendant Saunders has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Saunders signed the 2024 10-K, which contained false and misleading statements, and solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Vo, Hosseinion, Grenas, Reed, Spears, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to Nutex. Additionally, Defendant Saunders, as a Company director, benefits materially from the increased number of shares made available for payment under the 2025 Amendment to the 2023 Plan which stockholders approved on the basis of the materially false and/or misleading 2025 Proxy Statement. For these reasons, Defendant Saunders breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or

disinterested, and thus demand upon him is futile and, therefore, excused.

143.   Additional reasons that demand on Defendant Spears is futile follow. Defendant Spears has served as a Company director since April 1, 2024. Defendant Spears has received and continues to receive lucrative compensation for his role as a director. Since 2017, Defendant Spears has served as a Physician Partner, Chief Medical Director, and ED Director at Alexandria Emergency Hospital in Alexandria, L.A., an affiliate hospital of Nutex. Thus, as the Company admits, Defendant Spears is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Spears signed the 2024 10-K, which contained false and misleading statements, and solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Vo, Hosseinion, Grenas, Reed, Saunders, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to Nutex. Additionally, Defendant Spears, as a Company director, benefits materially from the increased number of shares made available for payment under the 2025 Amendment to the 2023 Plan which stockholders approved on the basis of the materially false and/or misleading 2025 Proxy Statement. For these reasons, Defendant Spears breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.   Additional reasons that demand on the Board is futile follow.

145.   Defendants Saunders and Reed (collectively the "Audit Committee Defendants")

served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

146.    In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the schemes to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Director-Defendants violated the Code of Ethics by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Ethics and the law. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

147.    Nutex has been and will continue to be exposed to significant losses due to the

wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Nutex any part of the damages Nutex suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

148.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

149.    The acts complained of herein constitute violations of fiduciary duties owed by Nutex's officers and directors, and these acts are incapable of ratification.

150.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Nutex. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Nutex, there would be no

directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

151.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Nutex to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

152.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

153.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security)

registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

155.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

156.    Under the direction and watch of Defendants Vo, Hosseinion, Creem, Grenas, Reed, Saunders, and Spears, the 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company engaged HaloMD to serve as its IDR vendor; (2) HaloMD engaged in fraudulent conduct to achieve substantial arbitration results for Nutex; (3) the revenue generated through the engagement of HaloMD was unsustainable; (4) the Company failed to maintain internal controls, particularly regarding its financial reporting; (5) the Company overstated its ability to remediate such failure to maintain internal controls; (6) on account of such failure to maintain internal controls, the Company improperly calculated particular stock based compensation obligations by treating such obligations as equity as opposed to liabilities; (7) as a result of the foregoing, the Company would be substantially less likely to timely file its reports with the SEC. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

157.    The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees'

risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

158.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the election of the Company's directors.

159.    As a result of the material misstatements and omissions contained in the 2025 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Vo, Hosseinion, Grenas, Reed, Saunders, and Spear to the Board, thereby allowing them to continue breaching their fiduciary duties to Nutex; (2) elect non-party Jaumot to the Board; (3) approve on advisory basis the executive compensation for the Company's named executive officers; (4) approve an amendment to the 2025 Amendment to the 2023 Plan to increase the number of shares available; and (5) ratify the appointment of Grant Thorton LLP as the Company's independent registered public accounting firm for the year ending December 31, 2025.

160.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2025 Proxy Statement.

161.    Plaintiff, on behalf of Nutex, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

162.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163.    Each Individual Defendant owed to the Company the duty to exercise candor, good

faith, and loyalty in the management and administration of Nutex's business and affairs.

164.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

165.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nutex.

166.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Nutex's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company engaged HaloMD to serve as its IDR vendor; (2) HaloMD engaged in fraudulent conduct to achieve substantial arbitration results for Nutex; (3) the revenue generated through the engagement of HaloMD was unsustainable; (4) the Company failed to maintain internal controls, particularly regarding its financial reporting; (5) the Company overstated its ability to remediate such failure to maintain internal controls; (6) on account of such failure to maintain internal controls, the Company improperly calculated particular stock based compensation obligations by treating such obligations as equity as opposed to liabilities; (7) as a result of the foregoing, the Company would be substantially less likely to timely file its reports with the SEC. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

167.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

168.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

169.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Nutex's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent it from continuing to occur.

170.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

171.    As a direct and proximate result of the Individual's Defendants' breaches of their fiduciary obligations, Nutex has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

172.    Plaintiff, on behalf of Nutex, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

173.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Nutex.

175.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Nutex that was tied to the performance or artificially inflated valuation of Nutex, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

176.    Plaintiff, as a shareholder and representative of Nutex, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

177.    Plaintiff, on behalf of Nutex, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Nutex, for which they are legally responsible.

180.    As a direct and proximate result of the Individual Defendants' abuse of control, Nutex has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Nutex has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181.    Plaintiff, on behalf of Nutex, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

182.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Nutex in a manner consistent with the operations of a publicly held corporation.

184.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Nutex has sustained and will continue to sustain significant damages.

185.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiff, on behalf of Nutex, has no adequate remedy at law.

- 63 -

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Nutex to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

189.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

190.    Plaintiff, on behalf of Nutex, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Vo, Bates, and Hosseinion for Contribution Under Sections 10(b) and 21D of the Exchange Act

191.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.    Nutex and Defendants Vo, Bates, and Hosseinion are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Vo's, Defendant Bates', and Defendant Hosseinion's willful and/or reckless violations of their obligations as officers of Nutex.

- 64 -

193.    Defendants Vo, Bates, and Hosseinion, because of their positions of control and authority as officers of Nutex, were able to and did, directly, and/or indirectly, exercise control over the business and corporate affairs of Nutex, including the wrongful acts complained of herein and in the Securities Class Action.

194.    Accordingly, Defendants Vo, Bates, and Hosseinion are liable under 15 U.S.C § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act

195.    As such, Nutex is entitled to receive all appropriate contribution or indemnification from Defendants Vo, Bates, and Hosseinion.

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Nutex, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Nutex;

(c)    Determining and awarding to Nutex the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Nutex and the Individual Defendants to take all necessary actions to reform and improve Nutex's corporate governance and internal procedures to comply with

applicable laws and to protect Nutex and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> 2. a provision to permit the shareholders of Nutex to nominate at least four candidates for election to the Board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Nutex restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 8, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/ Saadia Hashmi*

Saadia Hashmi
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Juan Camilo Jimenez, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8__ day of September, 2025.

Firmado por:

*Juan Camilo Jimenez*

1256C0C82664428...

Juan Camilo Jimenez